May it please the Court. Kevin Vianna Fuller was one of my former law clerks. Well, I intended to begin by saying that I thought her brief was erudite. Could you introduce yourself for the record, please? I will, Your Honor. I'm Kevin Vianna. I'm a Deputy Attorney General for the State of California. I'm here on behalf of the appellant and the underlying respondent in the habeas corpus matter. Her birthday was a couple of days ago. Happy birthday. In this case, we believe the district court made a mistake that derives from an improper analytical approach in an AEDPA matter. In Richter, the United States Supreme Court criticized lower federal courts in this regard. They said, we see no difference. Don't say lower federal courts. All right, I won't say that. The Supreme Court said when they analyzed the underlying decision, they said we see no difference in the court's treatment of this case from the way it would have treated it if the AEDPA didn't exist. Well, let's just get to the meat of the case. Under AEDPA, we have to determine whether the state court's application of Darden was unreasonable, not just wrong, but unreasonable. And do you agree that that's our inquiry? I agree that Darden is the standard, and that is the standard here. Okay. So under that standard, why isn't the district court perfectly correct? And I guess we have de novo review under that same standard, so why isn't the court's conclusion absolutely correct under Darden? Because the district court failed to look at the case and ask whether an argument can be made to support. Okay, but that's what I'm asking you now. Tell me why, because it looks to me like no reasonable jurist could have concluded that due process was respected here. I hope to change your mind very shortly. A proper analysis would have begun, as the court did, with identifying the applicable Supreme Court precedent. Okay, we're past that. Tell me about the facts. Ed, my particular focus while you're doing this, I am particularly concerned about not so much the statements that you're calling this guy a liar, but the emphasis on the fact that you're making these people lose their job. Because that seems an extraneous consideration, a completely extraneous consideration, which could easily have influenced the result. So as you're making your argument, I'd like... I will try to keep in mind. All right, a proper analysis would have looked at the nature of the error, and timing is important here. In 2003, when this case was tried, and in 2004 when the Court of Appeal addressed the Darden question, it was not at all clear that these were they lying questions were even error. As the state court indicated, and as... But under Darden itself, they were clearly wrong. Well, under Darden, there's got to be an error to begin with. That's what Tan v. Runnell says. And it's not clear, or it wasn't clear in California until this very case, that those questions are wrong. And at the time, as the Court of Appeal explained, courts across the nation had taken three separate approaches. One... But you see, this is all why I've asked you to focus, to some degree, on the other point. Because if they got... Under Darden, would it not be wrong to say the reason you should... this person should lose... should be found guilty is because if he's not the policeman, they're going to lose their jobs, and you really better worry about that? And I think that's a fascinating and unanswered and unraised question. For me, the most interesting aspect of this entire trial was that in rebuttal, the prosecutor called the police officer to the witness stand and said, what happens if you get caught in a lie in trial? Of course, it's completely misleading and ridiculous anyway, because he isn't going to lose his job, and they're probably not even going to look into whether they lied. So let's leave that aside. But even if it were true that he was going to lose his job, isn't that just not a relevant consideration, which the jury should never have been told about or thought about or been encouraged to think about? Yes, indeed. I would say it's analogous to the situation in Darden, where the prosecution was suggesting to the jury that they had to convict to send a message to the Department of Corrections not to let people out. It was extraneous. So why isn't this a clear Darden error? Because the mistake was unlikely to have achieved what the state court said and what the district court said was the impropriety. I don't understand what you're saying. Are you saying this didn't affect the outcome of the trial? Yes. How is that possible? Almost the entirety of the trial was very short, and it was a credibility dispute between the police officers who were being bolstered by improper questioning and the defendant. That was it. There wasn't any physical evidence at all that was independent of I wasn't finished with my question. I'm sorry. That was independent of the officer's credibility. In other words, there wasn't fingerprint evidence, there wasn't DNA evidence that demonstrated possession of these drugs. It was only the police officer's testimony that connected the defendant. So their credibility was everything, and that was the whole trial. So how could it have not affected the outcome? The answer to that question really comes down to this. What happened in the questioning of Mr. Zambrano would have been perfectly appropriate in argument. That is, there are two sides in this case. The police officers say this happened. Mr. Zambrano said not this happened. Both sides have said that this isn't a memory problem. Mr. Zambrano specifically said And you better rule for the prosecution because otherwise the police are going to lose their job? Well, Your Honor, I think I agree that that question was incorrect. Well, it's a question. He said it in oral argument in some length. I mean, in his closing argument. Well, the prosecutor said it, and the witness said it. And he used it in examination. And the witness said it. So if the witness So that was all wrong. That's the point. If that was all inadmissible and a constitutional violation under Darden, then I guess in the particular, I can understand that there could be a three-week trial in which this is a blip, in which it could have no effect on anything. But in this trial, it seemed to me that it was the entire case, basically. Well, I think it was not the entire case. But I think with the possible exception, which was based on evidence, that is, the officer testified. I believe incorrectly, but that's not what's raised here. I believe the officer was incorrectly permitted to testify about that. But the questions about was someone lying? They do this all the time. Prosecutors need a little restraint. Yes, Your Honor. You can keep your voice down. I'm sorry. I have hearing aids now. I can hear you well. This was not simply a he said, she said case. The prosecution's case was strong. Two witnesses observed Ms. East take them to Mr. Zadravsky. But it wasn't he said, she said trial. Pardon me? It was he said, she said. There were two he's on one side and one he on the other side, but it was still he said, she said.  and one of the stories unreasonable. Well, actually, I don't know about that. Let me hear what your reasons are, but I have a counter reason. Go ahead. Why was Mr. Zambrano there? Mr. Zambrano says he was there to work. Well, and he's described his work as cleaning trucks. That is absolutely unsupported, and it is contradicted by the absence of any evidence that he had materials in his possession to do any cleaning at all. When he first encounters Ms. East, he's not in the front part of the truck where cleaning would be done. He's in the rear area of the truck. That's why he's in the area. It doesn't mean he's doing it at that second. Okay. But if he's cleaning trucks, then his materials would be there somewhere. Let me tell you what I think is actually fairly illogical. Why would this woman say, I'm doing it this way so he doesn't get charged with selling the cocaine when the consequence will be that she'll get charged with selling the cocaine? Well, I think the answer to that is clear from Mr. Zambrano's statement to Officer Escarp, and that is Zambrano says, I never sold. I just gave the stuff to Ms. East. Both of them were sadly confused about liability for sale. Mr. Zambrano eventually admitted that he possessed two pieces of rock cocaine. I understand that. And he told the officer, he said to the officer, I didn't sell. But how does her statement make any sense? They appear to have believed that Mr. Zambrano could not be guilty of sale. I understand that, but how could she not be guilty of the sale? Well, I think her response would be, I got no money. Now, it's foolishness, but we don't prosecute many criminal geniuses, and certainly neither of these people qualify as criminal geniuses. Well, you know, the harmless error analysis in this context is difficult because it isn't enough to say that with the right evidence, you also might have convicted the person. That's not quite the standard. It is more whether the erroneous or unconstitutional questioning had an effect on the jury in the case as it was tried. And it seems to me that it would have been a tough case to prove. I'm sorry, I don't want to interrupt. I don't want to interrupt. I tried a bunch of these in the DA's office, and this is not a difficult case to prove. We had two officers at the scene. They were backed up by two other officers, and we had another officer who came to assist ostensibly as a Spanish interpreter. So for the jury to see the police as lying, they'd have to see that there is a great conspiracy to convict Mr. Zombrano. On the other hand, Mr. Zombrano's statement is completely incredible. That is, Mr. Zombrano says, I was standing there, and the officer came up and stuck a gun against my head and threw me to the ground. I had done nothing. Perfectly unreasonable. So you think it was really a good, strong case? I think very prosecutable, easy to convict. Easy to convict. Yes, sir. So then tell me this. Why did the prosecutor have to muck it up? So many of them do. I always wonder about that. You've got to thank them for bringing us more business. I'm happy to have my job, but why did the prosecutor muck this up? I reread almost all of the record last night. I read both arguments. As I viewed it, I saw the defense counsel as sort of phoning it in, and I saw the prosecutor as uncertain of her case and young and inexperienced. Well, that doesn't mean that it wasn't. But the question, did it affect the jury in a way that's improper? And I think the answer is no, because the major effect, had the case been tried by a better prosecutor, would have been, look, we have two tales here. We have one where several police officers involved said that Mr. Zimbrano had the drugs. We have Mr. Zimbrano. I mean, there were two. I don't know. You had three other people there, but they had nothing to do with it. They were not on the scene. They didn't testify, but they were involved, and they would have been involved to the extent that passing the money to Officer Escarp, making sure that Officer Escarp doesn't have drugs on him. They had to come from somewhere. And so, you know, it's a fairly large police enterprise. They didn't testify, so that's relevant. Let me ask you a conceptual question. My understanding is that the Darden Standard almost incorporates a harmless error in it. In other words, that it has to be sufficiently outrageous to deprive them of a fair trial, which seems to be the same thing as saying it would have been otherwise. Yes. Maybe even stronger than a Brecht Standard. I think one of the Ninth Circuit cases that my opponent referred to said it's even stronger than Chapman, that the standard is more stringent than Chapman, harmless beyond a reasonable doubt. Well, that doesn't seem likely, but it's at least stronger than or as strong as Brecht. Yes. So there's no second harmless error inquiry here, really. I agree. I think that the entire analysis is was there an error? Was it serious? Was it big enough to have affected the jury in a way that rendered the trial fundamentally unfair? Does Darden tell us what fundamentally unfair means? No one does. I don't think anyone can. It's like reasonable doubt, perhaps. But I think this case was not fundamentally unfair because... Yes, reasonable doubt is not hard to define. Well, I deal with case after case where the defense bar says that the standard California jury instruction doesn't define it adequately. They're probably right. I think it is difficult to define out of context. You know how the British define it? I do not. We'll go to trial court London. The judge says before you can convict so-and-so of the crime of, you must be convinced of his guilt beyond a reasonable doubt. That means you must be sure. I enjoy that. That's the argument I used to make as a trial lawyer. I've taken more of my time and, of course, been very patient. I'd like to finish with just one point, addressing your concern about didn't this matter? Didn't this make it fundamentally unfair? And I think what makes it clear that it did not is this. As the Court of Appeal said, as the California Supreme Court had said a year earlier in Foster, which is in the Court of Appeal opinion, there are some states, some jurisdictions that say these questions are never error because they do no more than highlight a conflict. The reason I started where I did is because I have a certain amount of sympathy for that position with regard to the lying statement. I've never quite understood if somebody says X happened and somebody else says Y happened and you say, is he lying? I mean, a sophisticated person will say, well, not necessarily. He could have been mistaken. But still, it's pretty close and it doesn't seem like a very big difference. But the difference here is that it went beyond that and they asked the jury to focus strongly on something, A, that almost surely wasn't true, but B, was totally extraneous. And that seems in a way, in a personal way, do you want Mr. So-and-so to lose his job? That's different than, you know, there's some abstract possibility that you might influence the policy of the Department of Justice. Mr. So-and-so is going to lose his job if you do this. Well, I think, in fact, there are plenty of cases that say that that argument is improper and can be misconduct when there's no evidence on that issue. And what's unusual about this case is there was evidence on this issue. But the evidence wasn't totally incompetent evidence. It was objected to. It shouldn't have been allowed in. And it was incompetent. So now we're doing a different appeal. No, it was objected to on the ground that it should never have been let in. So the fact that there was evidence that should never have been let in is not pertinent. But this case was argued in the state courts and in the district court on the theory of were they lying? Not only. I don't recall, and I certainly could be mistaken, I often am, but I don't recall a single reference in the district court's decision to that or the court of appeals. And I reread the appellant's brief. And the issue was that the we were lying questions were incorrect. Well, what a lot of this comes down to is very close to vouching. Yes, Your Honor. And that has been the flaw in the would the officer take this risk of losing his job. That is vouching if there's no evidence with regard to the officer losing his job. Without question, that's vouching. And I agree with you, Your Honor, that it seems like improper evidence to ask the officer. Although it is in some ways similar to the question that's asked of defendants on the occasions when they testify. The concluding question by defense counsel is, Mr. Smith, would you lie to the jury? And Mr. Smith goes, no, I wouldn't lie to the jury. That's unnecessary. That was present and obvious in his oath, that there's a risk in lying. Thank you. All right. Thank you, Your Honor. Perhaps I'll have some rebuttal, but I have a little. I've made most of the points I hope to make. Yeah. All right. Thank you. Good afternoon, Your Honor. Brianna Fuller on behalf of Petitioner Dolatowsky and Brano. Counsel, I have a question at the outset. The issue that Judge Berzon has been talking about, I have a somewhat different understanding of the record than her questions suggest, so I would appreciate your clarifying it. It was my understanding that counsel did not object to the questions at trial concerning losing their jobs. There was a series of questions and answers on, you know, I've been there 15 years and I would put my job at risk and he's been here 10 years and whatnot. I didn't see an objection, and the California Court of Appeal specifically noted in their opinion that there was no objection made. So was there an objection or not? I was trying to double-check my answer to that just before I got called to the hot seat. My memory is that it was not an objection. I thought that the point at which there was an objection to the cross-examination was when that was raised. It was raised? In the cross-examination of some Brano. Yes, I'm sorry, I understood Judge Graber's question. It wasn't raised again on the direct examination. Exactly. But what the district court said, as I recall, in fact what the Court of Appeal said was essentially you didn't have to keep doing it, but the point at which you raised an objection to the cross-exam was not to the lying statements as such, but to the statement about aren't these guys going to lose their job? That's right, and I'm sorry, perhaps I understood Judge Graber's question wrong. The question was, so you want this jury to believe is that Officer Dorsey and Corporal Escarpaye are going to risk their jobs and come in here and lie to them. That was the point that the objection was made. Okay, so it was objected to. It wasn't re-objected to during rebuttal. I thought that was your question. But as I was going to go on to say, and as Judge Berzon pointed out, the California Court of Appeal said that it would have been futile to continue once the judge had ruled on that issue already. My opponent says that Mr. Zambrano's story was implausible because his testimony was that the officers simply came up behind him, threw him to the ground. I think it's important to remember that although that was his testimony, that was his perception, that wasn't his theory of the case. The theory of the case wasn't that the officers were simply running around looking for people to knock over and arrest. It was that he was in the proximity, that he was there on the scene, but that simply he hadn't been involved. And I think one of the better pieces of evidence of that is that we have the testimony that Lulan East was saying, well, here, we're going to do this complicated transaction. You put the money here. I'm going to give you the drugs. And yet even the officer said that Mr. Zambrano's level of English was that he knew, and this is at Excerpts of Record 269, his name. He was able to say his name and stuff like that. That's a complicated transaction to be explaining in English to a person whose level of English is something like his name. Unless the Court has questions, given the late hour, I'm happy to submit. I guess my only question is, was this the – did the California Court of Appeals and the district court and your brief discuss – make this concern about the officers losing their job part of the issue, or was it not relied upon? That's – your opponent says it was really not part of the issue in this case. I would agree that the focus of the California Court of Appeal was on the are they lying question. It certainly mentioned that that was aggravated by the rebuttal testimony and then by the mention in closing argument. The California Court of Appeal, I think, was more focused on the are they lying question. I do believe in the brief, however, that they raised this issue about, well, you know, her argument, it's common sense, nobody's going to risk their job. That was certainly part of the briefing that the appellant made and that was then kind of repeated on. I think it was attached to some of the various pleadings. But I think it was initially raised there, but it wasn't the focus of the California Court of Appeals decision specifically. And the district court here? The district court decision, I believe – it's hard when you've read so many things on the same topic to keep track of what was said. I believe that the district court mentioned it but probably didn't focus on it as much as maybe I focused on it in my brief. Okay. Because I do think it's a particularly problematic aspect. Okay. No further arguments, Your Honor. Why don't you try to get the word out? I mean, the attorney general's office has sort of overall influence, jurisdiction over all of the district attorney's offices. I went to work with the district attorney's office, or with the attorney general's office, near the end of 2001. Shortly after that, I first began to observe some cases that were analyzed in deep. Were they lying questions? And I was frankly surprised that it had taken so long for it to arise because they're obviously improper opinion evidence, and they are obviously irrelevant. What difference does it make whether the defendant thinks someone is lying or not? What they really are is argumentative questions. That is, is the prosecutor trying to get his or her argument made through the defendant? Well, there's an element of vouching and all the rest of it, so maybe you ought to talk to the attorney general and have her review some of these arguments that are being made. I would like to say, however, that I really appreciate your argument. I'm sometimes frustrated by the attorney general's presentations, and yours was excellent. Thank you. I appreciate both counsel's arguments. Thank you. Well, what did you say? What? What did you just say? I said that he did a very good argument. That's all I said. Well, how about her? She did, too. She did, too? But she didn't say very much, wisely. Which was a good argument. Very wisely. She wisely didn't say much, but it was more by contrast to other attorney generals. I know I'm talking into the wind, but the attorney general's office ought to get involved in this and get the word to the prosecutors on what's proper and what is improper, because this goes on all the time, and not only in federal courts but in state courts. Your Honor, if I could respond just really briefly to that, and this isn't my argument, but the law was uncertain in several jurisdictions in the early 2000s when this case was decided. This very case, I think, said very emphatically to the district attorney's offices, Don't do this. You know, when you've got a case that should take a good prosecutor about five minutes to try, and then you muck it up so it comes up on appeal, and a lot of money is spent and a lot of time is spent and wasted, somebody's got to go down there and talk to those people and train them and call these things to their attention. You know, we spend, the federal government spends, who knows, millions and millions and millions and millions of dollars on habeas appeals from state prisoners. And you know why that's done? You know why? Because the state courts aren't doing their job. The federal judges do their job. We have federal habeas, and we get very, very few of those because every federal judge has got a fixed responsibility for that case and knows if it comes back, that judge is going to get it again. So they deal with it properly. But in the state system, the way it works is you make a ruling, you get rid of it, and when it comes back, it goes to somebody else. So why worry about it? So there's just a lot of things like that. And we have, like in L.A., you probably have, oh, 2,000 habeas petitions. See, someday you're going to be attorney general. I want you to remember this. You have 2,000 habeas petitions filed in the district court downtown. Maybe one or two are granted all year. And then the attorney general goes crazy about interference by the federal.
judges: Pregerson, Graber, Berzon